[Cite as *Northpointe Properties v. Charter One Bank*, 2011-Ohio-2512.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
EN BANC
**No. 94020**

## NORTHPOINT PROPERTIES, INC.

PLAINTIFF-APPELLANT

vs.

## CHARTER ONE BANK, ET AL.

DEFENDANTS-APPELLEES

**JUDGMENT:**
AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED

Civil Appeal from the
Cuyahoga County Court of Common Pleas

Case Nos. CV-494961 and CV-589150

**BEFORE:** En Banc Court

**RELEASED AND JOURNALIZED:** May 26, 2011

**ATTORNEY FOR APPELLANT**

Angelo F. Lonardo
Yelsky & Lonardo
75 Public Square, Suite 800
Cleveland, OH   44113


**ATTORNEYS FOR APPELLEES**

**For Charter One Bank, FSB and Thriftco, Inc.**

George H. Carr
Timothy J. Fitzgerald
Shane A. Lawson
Gallagher Sharp
6th Floor, Bulkley Building
1501 Euclid Avenue
Cleveland, OH   44115

**For Ehle Morrison Group, Ltd. and Bruce Morrison**

Brendan R. Doyle
Tim L. Collins
Julie A. Perkins
Collins & Scanlon LLP
3300 Terminal Tower
50 Public Square
Cleveland, OH 44113-2289

SEAN C. GALLAGHER, J.:

{¶ 1}  Pursuant to App.R. 26 and Loc.App.R. 26, this court determined

that a conflict existed between the panel decision in this case and our prior

decision in *Krantz v. Schwartz* (1992), 78 Ohio App.3d 759, 605 N.E.2d 1321. Accordingly, we **granted en banc consideration in this matter and convened an en banc conference in accordance with** *McFadden v. Cleveland State Univ.*, 120 Ohio St.3d 54, 2008-Ohio-4914, 896 N.E.2d 672, on the question whether a plaintiff alleging fraud in a commercial real estate transaction is limited to recovery of the difference between the value of the property as represented and the value as actually delivered. We hereby vacate the court's decision released on January 13, 2011,[1] and issue this en banc decision as the final decision in this appeal.

{¶ 2} This is an appeal and cross-appeal from the judgment of the Cuyahoga County Court of Common Pleas on claims of fraud and spoliation.[2] For the reasons stated herein, we affirm in part, reverse in part, and remand the case to the trial court for further proceedings consistent with this opinion.

**BACKGROUND FACTS**

{¶ 3} This case arises out of the 1997 sale of a 15-story commercial office building located at 75 Public Square, Cleveland, Ohio ("the building"). Plaintiff-appellant, Northpoint Properties, Inc. ("Northpoint"), purchased the building from Thriftco, Inc. ("Thriftco"), a wholly owned subsidiary of Charter

---

[1] *Northpoint Properties, Inc. v. Charter One Bank*, Cuyahoga App. No. 94020, 2011-Ohio-68.

[2] The lower court action involved two consolidated cases, Cuyahoga County C.P. case numbers CV-494961 (the fraud action) and CV-589150 (the spoliation action).

One Bank, F.S.B. ("Charter One"). Northpoint claims that when purchasing the building, it justifiably relied upon fraudulent representations about, and the concealment of, the condition of the building's fire-suppression system and domestic water lines. The building was built in 1913. A record dated June 27, 1986 from the city of Cleveland's Fire Prevention Bureau reflects that an existing six-inch water supply line had been capped in the basement and that "[t]he water supply is brought into the [building] through a [three-inch] supply that services both domestic and fire needs."

{¶ 4} In January 1996, Charter One took possession of the building through a deed in lieu of foreclosure. Shortly thereafter, inspections of the property were conducted by Kaczmar Architects, Inc. ("Kaczmar"), and Pyramid Electric, Inc. The Kaczmar-Pyramid report ("Kaczmar Report") recommended that a fire-protection expert be retained to "recommend changes to the sprinkler, standpipe, fire hose cabinet and fire pump system." Despite this recommendation, no action was taken.

{¶ 5} A Phase One Environmental Site Assessment prepared on February 21, 1996, by Environmental Consulting Group, Inc., indicated that there were no current serious code or regulatory violations and that "[t]he water for this property is provided by a regional public water system, and is considered safe for human consumption." A second Phase One

Environmental Site Assessment dated August 13, 1997, made the same findings.

{¶ 6} Charter One retained Ehle Morrison Group, Ltd. ("EMG"), for the management, leasing, and sale of the building. Bruce Morrison is a principal and owner of EMG. Frank Schwartz was hired as the building manager. On May 1, 1996, Charter One transferred title to the building to Thriftco, a wholly owned subsidiary of the bank.[3]

{¶ 7} Schwartz received regular complaints from tenants about the taste of the drinking water. He also had tasted the water and found it "unpleasant." In the summer of 1996, a fire inspector informed Schwartz that the six-inch fire standpipe was cut and capped and that there was no fire pump. He was also informed that the domestic water line had been tied together with the fire-suppression system. Further, the water gauge on the 15th floor showed the pressure was not sufficient to run the sprinklers on that floor. Schwartz relayed this information to Morrison of EMG.

{¶ 8} The architectural and engineering firm of Brandstetter Carroll Zolfcin, Inc. ("Brandstetter"), conducted inspections of the building in June and November 1997 and issued a property inspection report. Brandstetter

---

[3] One of the claims made by Northpoint is that Thriftco is an alter ego of Charter One that was created in part to "'insulate the Bank from liability' (including liability from a fire) inherent with ownership of a multi-tenant commercial office building with a defective fire suppression system." Thriftco had director and officer liability insurance coverage of $20 million with no deductible.

had the Kaczmar Report when it prepared its report ("Brandstetter Report"). The Brandstetter Report states as follows: "There are presently no standpipes in the stairwells which does not comply with today's code requirements for a high rise building. The fifteenth floor is sprinklered from the domestic water system with booster pumps in the basement. There are fire hoses located throughout the building. For these to be effective, the water pressure should be verified. It is questionable whether the fire department would want these to remain in service."

{¶ 9} EMG prepared a property information packet ("PIP") and additional paperwork for distribution to prospective purchasers. Daniel Dzina, the president and owner of Northpoint, expressed interest in purchasing the building. He received both Phase One Environmental Site Assessments as well as the Brandstetter Report. However, the Kaczmar Report was not disclosed. The paperwork provided and purchasing instructions specified that the building was being sold in its "as is, where as" condition, contained disclaimers regarding representations and warranties, and indicated that buyers could only rely on their own inspections and investigations of the property.

{¶ 10} Because no serious code or regulatory violations were reported with the building, Northpoint did not obtain an independent property inspection before purchasing the building. Dzina, an experienced real estate

purchaser, went on two tours of the building and did not observe any defects in the fire-suppression system. He viewed the basement of the building, which was "jam packed" with boxes. He looked at the water lines and observed the capped six-inch water supply line. Dzina was aware that the fire-suppression system was being fed from the domestic water system, and that there was a check valve to prevent contamination. However, the tie-in of the domestic and fire water lines was not observable because it was located behind a wall. Further, it appeared from the pressure gauges in the basement and on the 15th floor that there was adequate pressure for the fire-suppression system.

{¶ 11} Dzina testified he was aware of the recommendation in the Brandstetter Report that for the fire hoses to be effective, the water pressure should be verified. Instead of having the fire hoses tested, Northpoint replaced them after acquiring the building.

{¶ 12} Dzina claimed that had he received the Kaczmar Report and its recommendation that the services of a fire-protection expert be obtained "to recommend changes to the sprinkler, standpipe, fire hose cabinet and fire pump system," he would have hired an expert to determine what needed to be done and negotiated a lower price on the building or walked away from the sale.

{¶ 13} On December 29, 1997, EMG provided Northpoint with an appraisal of the building in the amount of $3.1 million. On December 31, 1997, Northpoint entered into a sale agreement with Thriftco to purchase the building in its "as is" condition for $3.15 million. This agreement specifically disclaimed any representation as to the nature and condition of the property.

{¶ 14} Northpoint took possession of the building on January 1, 1998. After taking possession, Dzina discovered that the fire-suppression system was not working properly. He went through the building with a fire inspector and was informed of the tie-in of the domestic and fire water lines and of the absence of a fire pump. Dzina also received complaints about the taste of the drinking water.

{¶ 15} Northpoint hired Joe Stojkov from Tri-S Plumbing to perform an inspection. Stojkov discovered that a required check valve, or flapper, which prevents the backflow and mixing of water and subsequent contamination, was missing. He also discovered that pressure gauges had been pegged to read a fixed pressure, that the disconnected six-inch water-supply line had no pressure, and that a fire pump was missing. He stated that the three-inch line was insufficient to provide the volume of water needed for the fire-suppression system.[4] He also testified that he could tell from the odor of

---

[4] Stojkov testified that the fire department would be able to hook up their tanks to a fire department connection outside and pump water into the risers with adequate pressure to put out a fire

the building's drinking water that it was contaminated and that it had the same distinct smell that is associated with sprinkler water. Stojkov admitted that he could have identified all of these conditions, except the missing check valve, if he had inspected the building prior to Northpoint's purchase.

{¶ 16} Northpoint spent $280,000 to repair the water lines and fire-suppression system and for the purchase of a fire pump. Northpoint did not inform Charter One of its claim until after the repair and replacement work had started and did not preserve evidence relating to the condition of the pipes or the back-flow prevention valve.

### LAWSUIT, TRIAL COURT RULING, AND APPEAL

{¶ 17} Northpoint filed an action against Charter One, Thriftco, and EMG, raising claims for fraud and breach of contract. Northpoint filed a separate action against Charter One, Thriftco, EMG, and Morrison for spoliation of evidence. The cases were consolidated.

{¶ 18} The trial court granted summary judgment in favor of the defendants on the breach of contract claim. The case proceeded to a bench trial on the remaining claims for fraud and spoliation. The trial court entered judgment for the defendants on Northpoint's spoliation claim. The trial court made a varied determination on the fraud claim.

---

on the 15th floor. However, inadequate pressure would exist without the assistance of the fire department.

{¶ 19} The trial court found that Northpoint failed to prove the defendants engaged in fraud with respect to non-latent defects. The court noted that the property was being sold in its "as is" condition; that Dzina observed the capped six-inch water supply line and knew of the tie-in; that plaintiff's expert testified he could have discovered the pressure gauges, disconnected six-inch fire water line, and the absence of a fire pump had he inspected the property before Northpoint's purchase; and that there was no evidence that the absence of a fire pump had been concealed. The court further recognized that the Kaczmar Report recommended only that a fire protection expert be retained to recommend changes, but did not point to any defects or code violations. The court found the Kaczmar Report was used to prepare the Brandstetter Report that, together with the Phase One Site Assessments and the absence of citations for code violations, did not support a finding that there were any knowingly false representations. In finding no intent to induce reliance or justifiable reliance, the court considered that disclaimers were made and that despite the disclosure in the Brandstetter Report about fire hoses and water pressure, Northpoint failed to inquire further or obtain an independent inspection of the property. Finally, the court found Northpoint failed to provide sufficient evidence of its resulting injury.

**{¶ 20}** The trial court continued to find that fraud was established with respect to latent defects in connection with the building's drinking-water system. The court determined that both the tie-in of the domestic water line and the missing check valve were latent defects. The court indicated that although all parties knew of the tie-in, only EMG was aware of the complaints from tenants about the taste and odor of the drinking water. The court found that the Phase One Site Assessments that were provided to Northpoint indicated that the water was safe for human consumption, that EMG was aware of the tie-in and complaints about the drinking water and should have known about the drinking-water contamination, that Northpoint justifiably relied upon the false representations, and that the other elements for fraud were met. Despite finding fraud had occurred in this regard, the trial court determined that Northpoint failed to demonstrate its resulting injury. Northpoint presented evidence of its cost to repair the water lines and fire suppression system, but did not present evidence of diminution in value of the property. The trial court determined the "cost of repair" was not an appropriate measure of damages.

**{¶ 21}** The trial court issued a subsequent nunc pro tunc entry extending its judgment to Charter One and Thriftco. Northpoint timely filed this appeal, raising three assignments of error for review, and appellees filed a cross-appeal, raising one assignment of error.

**MEASURE OF DAMAGES**

{¶ 22} We begin by addressing Northpoint's first assignment of error, which provides as follows:

{¶ 23} "I.   The trial court committed reversible error in finding that the correct/applicable measure of damages in the case below was 'loss in value' instead of 'cost to repair.'"

{¶ 24} Although the trial court found the defendants engaged in fraud in the sale of the building, the court declined to award Northpoint damages after a finding that no evidence for the appropriate measure of damages had been presented to the court.   Northpoint provided evidence as to the cost of repair, but did not provide evidence as to the diminution in value of the building. Northpoint argues that the cost of repair is an appropriate measure of damages and that the trial court should have awarded it the $280,000 it paid to repair the fire-suppression system and water contamination defects.

{¶ 25} We are presented with the issue of whether cost of repair is an appropriate measure of damages for a claim of fraud involving the sale of commercial real estate.   Appellees contend that the measure of compensatory damages is limited to the difference between the actual market value of the property on the date of sale and the value as represented at that time.   They further argue that the measure of damages for commercial property should be distinguished from residential or noncommercial property.

**{¶ 26}** The last time the Ohio Supreme Court spoke on the issue in the commercial context was in 1930. In *Molnar v. Beriswell* (1930), 122 Ohio St. 348, 171 N.E. 593, the Ohio Supreme Court found the difference between the value of an apartment building as it was represented to be (wholly rented) and its actual value at the time of the purchase (partially rented) was an appropriate measure of damages in an action involving a sale induced by a vendor's fraudulent representation. However, the court did not find that this was the only measure of damages that could be applied. Rather, the court indicated that "[t]he party guilty of fraud is to be charged with such damages as have naturally and proximately resulted therefrom" and that competent evidence of damages would presumably be permitted in ascertaining the actual loss sustained by reason of the claimed misrepresentation. Id. at 353.

**{¶ 27}** In *Krantz v. Schwartz* (1992), 78 Ohio App.3d 759, this court, relying on *Molnar,* found that the measure of damages in a commercial transaction involving apartments with defective roofs was limited to the difference between the actual value of the property at the time of purchase and the value as represented at that time, with non-defective roofs. However, as discussed above, *Molnar* left open the possibility for other competent evidence of damages attributable to the fraudulent conduct. Insofar as this court refused to extend the cost-of-repair measure of damages to commercial transactions, we invalidate the *Krantz* decision.

{¶ 28} Indeed, the Ohio Supreme Court has recognized that "some flexibility is permissible in the ascertainment of damages suffered in the appropriate situation." *Apel v. Katz*, 83 Ohio St.3d 11, 20, 1998-Ohio-420, 697 N.E.2d 600. Further, this court has previously recognized: "A number of courts have held that an owner is not limited to the diminution in value of the property and instead may recover the reasonable costs of restoration to the property when the real estate is used for residential purposes, when the owner has personal reasons for seeking restoration, and when the diminution in fair market value does not adequately compensate the owner for the injury." *Krofta v. Stallard*, Cuyahoga App. No. 85369, 2005-Ohio-3720, ¶ 22, citing *Apel*, 83 Ohio St.3d 11; *Adcock v. Rollins Protective Serv. Co.* (1981), 1 Ohio App.3d 160, 440 N.E.2d 548; *Thatcher v. Lane Const. Co.* (1970), 21 Ohio App.2d 41, 254 N.E.2d 703; *Francis Corp. v. Sun Corp.* (Dec. 23, 1999), Cuyahoga App. No. 74966.

{¶ 29} In *Brewer v. Brothers* (1992), 82 Ohio App.3d 148, 611 N.E.2d 492, the Twelfth District Court of Appeals found that a vendor who had misrepresented the condition of a home's electrical system could be held liable for the cost of repairing the same. The court recognized that the cost of repair is an adequate measure of damages where there is fraud inducing the purchase or sale of real estate. Id. at 153. In making this determination, the court recognized as follows: "A person injured by fraud is entitled to recover

damages naturally and proximately resulting from the fraud. The fundamental rule is that the owner must be compensated for the loss sustained. * * * Where pecuniary damage does exist, evidence of the exact amount of the difference in value is not necessarily required. Where the existence of damage is established, the evidence need only tend to show the basis for the computation of damages to a fair degree of probability. In the present case, Brewer showed that the electrical system failed to meet the requirements of the local electrical code in many respects, that the defects constituted a fire hazard, and that he incurred substantial expense to have the defects repaired." Id.

{¶ 30} More recently, in *Martin v. Design Constr. Services, Inc.*, 121 Ohio St.3d 66, 2009-Ohio-1, 902 N.E.2d 10, the Ohio Supreme Court considered whether the failure to prove diminution in value was fatal to a claim for temporary injury to noncommercial real estate. The court noted its departure from its earlier decision in *Ohio Collieries Co. v. Cocke* (1923), 107 Ohio St.238, 140 N.E. 356, wherein the court restricted damages available for temporary injury to property from trespass to the reasonable cost of restoration, with the diminution in the property's fair market value as a limitation on the damages award. *Martin*, 121 Ohio St.3d 66, at ¶ 17-25. In *Martin*, the court recognized a shift from the *Ohio Collieries* rule and determined that diminution in value does not always provide a sufficient measure of damages.

Id. at ¶ 22. The court indicated that the focus of the damages inquiry should be on the "reasonableness" of the cost of restoration and that evidence of diminution in value is not necessarily required. Id. at ¶ 20-22. The court stated that "[w]hile evidence of loss in market value of the property may be relevant, *the essential inquiry is whether the damages sought are reasonable.* Either party may introduce evidence to support or refute claims of reasonableness, including evidence of the change in market value attributable to the temporary injury. But proof of diminution in value is not a required element of the injured party's case." (Emphasis added.) Id. at ¶ 25. Thus, the court's focus was upon the "reasonableness" of the damages awarded under the circumstances to make the injured party whole. Id. at ¶ 26-27.

{¶ 31} Although *Martin* was decided in a "noncommercial" context, the basic concepts followed therein have been applied in cases involving commercial property. See *Monroe v. Steen*, Summit App. No. 24342, 2009-Ohio-5163; *Case Leasing & Rental, Inc. v. Ohio Dept. of Natural Resources*, Franklin App. No. 09AP-498, 2009-Ohio-6573. As stated in *Monroe*: "[W]e cannot discern a meaningful distinction between commercial and residential property that would limit the Supreme Court's holding in *Martin* to residential property." Likewise, this court has recognized that both the difference in fair market value and the cost of repair are acceptable

measures of damages. *Klasa v. Rogers*, Cuyahoga App. No. 83374, 2004-Ohio-4490.

{¶ 32} This view is further supported by the Restatement of Torts. "Ohio courts have generally followed, whether specifically noted or not, the principles set forth in the Restatement (Second) of Torts when discerning the propriety and amount of damages in fraud cases." *Auto Chem Laboratories, Inc. v. Turtle Wax, Inc.* (Sept. 24, 2010), S.D.Ohio No. 3:07cv156. The applicable Restatement provision reads as follows:

> **"(1) The recipient of a fraudulent misrepresentation is entitled to recover as damages in an action of deceit against the maker the pecuniary loss to him of which the misrepresentation is a legal cause, including**
>
> **"(a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and**
>
> **"(b) pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation.**
>
> **"(2) The recipient of a fraudulent misrepresentation in a business transaction is also entitled to recover additional damages sufficient to give him the benefit of his contract with the maker, if these damages are proved with reasonable certainty."**

{¶ 33} Restatement of the Law 2d, Torts, Section 549 (1977) ("Measure of Damages for Fraudulent Misrepresentation"). Damages awarded under subsection (1) are known as "out-of-pocket" damages, while those awarded under subsection (2) are "benefit-of-the-bargain" damages. *Auto Chem*

*Laboratories, Inc.*, supra. Section 549 does not distinguish between commercial and noncommercial transactions.

{¶ 34} The out-of-pocket rule is normally applied to determine the measure of damages for a fraudulent misrepresentation. Restatement of the Law 2d, Torts Section 549, Comment *g*. However, situations may arise in which the out-of-pocket rule does not afford compensation that is just and satisfactory and its application would allow a defrauding party to escape all liability. Id. "The frequency of these situations has led the great majority of the American courts to adopt a broad general rule giving the plaintiff, in an action for deceit, the benefit of his bargain * * * and making that the normal measure of recovery in actions of deceit." Id.

{¶ 35} Therefore, it is recognized that the benefit-of-the-bargain rule may be an appropriate measure of damages when this measure can be established by proof in accordance with the usual rules of certainty in damages. Id. at Comments *g* & *h*. "If the defendant has undertaken to convey property of a certain description to the plaintiff, the plaintiff is entitled to an amount sufficient to give him the value of property of that description. * * * In order to give the plaintiff the benefit of the bargain, it is not necessary in all cases to give him the value of the thing as represented. He may be fully and fairly compensated if he is given the cost of making it as represented." Id. at Comment *l*.

**{¶ 36}** Consistent with the above authority, we find that the appropriate inquiry is whether competent evidence of damages has been presented to establish with reasonable certainty an amount sufficient to fully and fairly compensate the aggrieved party. In this case, Northpoint purchased a commercial property with a defective fire suppression system and contaminated drinking water, the condition of which was the basis for its fraud claims. Health and safety concerns required the repair of the defects. Northpoint presented evidence of the cost to repair the premises to conform with the defendants' representations. Further, because market value may not have been affected by the faulty systems, it is likely that the diminution-in-value measure of damages would not adequately compensate Northpoint and would effectively allow the defrauding party to escape liability.

**{¶ 37}** Under the circumstances herein, we find that the reasonable cost to repair is an appropriate measure of damages. Though not required, either party was free to support or refute the reasonableness of the damages with evidence of the change in market value. We also recognize that in regard to a reasonableness determination, a defendant may only be liable for damages that flow from the alleged fraudulent conduct and a plaintiff is not entitled to a windfall.

{¶ 38} Accordingly, we find the trial court erred in concluding that Northpoint failed to present evidence on the appropriate measure of damages. Northpoint's first assignment of error is sustained.

### JURY DEMAND AND WAIVER

{¶ 39} "II.  The trial court committed reversible error in allowing the unilateral withdrawal of defendants' jury demands and in striking Northpoint's jury demands."

{¶ 40} Pursuant to Civ.R. 38(A), "[a]ny party may demand a trial by jury on *any issue triable of right* by a jury * * *."  (Emphasis added.)  In this case, all parties filed written jury demands.  However, relying on a contractual jury-waiver provision, the defendants later filed notices withdrawing their jury demands and moved to strike Northpoint's jury demand.  The trial court ultimately struck Northpoint's jury demand and ordered the matter to proceed to a bench trial.

{¶ 41} Northpoint argues that the jury-waiver provision contained in the 1997 sales agreement between Thriftco and Northpoint should not be applied to entities who were not parties to the agreement.  Northpoint further asserts that pursuant to Civ.R. 38(D), none of the parties had a right to unilaterally withdraw their jury demands once filed.  Because Northpoint's argument raises legal questions, our review is de novo.

{¶ 42} The 1997 sales agreement between Thriftco and Northpoint contains a jury-waiver provision under which the parties "expressly waive trial by jury in any litigation arising out of, connected with, or relating to, this Agreement or the relationship created hereby." We are not persuaded by Northpoint's claim that this provision is ambiguous and recognize that no ambiguity challenge was raised in the trial court.

{¶ 43} The claims in this case pertain to allegations of fraud arising in the sale of the building from Thriftco to Northpoint. The allegations against Charter One, Thriftco, and EMG are connected by assertions of agency and alter ego relationships between these parties. Pursuant to traditional common-law principles of agency, a valid contractual jury waiver can be applied to a non-signatory agent or alter ego of the signatory corporation. See *Colorado Coffee Bean, LLC v. Peaberry Coffee Inc*. (Feb. 18, 2010), Colo. App. No. 09CA0130; *Tracinda Corp. v. DaimlerChrysler AG* (C.A. 3, 2007), 502 F.3d 212; *Mowbray v. Zumot* (D.Md., 2008), 536 F.Supp.2d 617.[5]

{¶ 44} Insofar as Northpoint argues that Civ.R. 38(D) does not allow the unilateral withdrawal of a jury demand, Civ.R. 39(A) instructs that "[t]he trial

_____

[5] Although we have found no Ohio decision on point, Ohio courts have recognized that a nonsignatory agent may enforce an arbitration agreement between a plaintiff and the agent's principal when ordinary principles of contract and agency require. See *Cleveland-Akron-Canton Advertising Coop. v. Physician's Weight Loss Ctrs. of Am., Inc.*, 184 Ohio App.3d 805, 2009-Ohio-5699, 922 N.E.2d 1012; *Genaw v. Lieb*, Montgomery App. No. Civ.A. 20593, 2005-Ohio-807; *I Sports v. IMG Worldwide, Inc.*, 157 Ohio App.3d 593, 2004-Ohio-3113, 813 N.E.2d 4.

of all issues so demanded shall be by jury unless * * * (2) the court * * * finds that a right of trial by jury * * * does not exist." "Federal courts have cited and applied [Rule 39(a)] in decisions striking a jury demand because the right to a jury trial, having been contractually waived, no longer existed." (Citations and quotations omitted.) *Mowbray*, 536 F.Supp.2d at 621. Applying this rationale herein, we find that the trial court did not err by enforcing the contractual waiver contained in the sales agreement and ordering the matter to proceed to a non-jury trial.[6] Accordingly, Northpoint's second assignment of error is overruled.

## ADEQUATE TRIAL COURT FINDINGS

{¶ 45} Northpoint's third assignment of error provides as follows: "III. The trial court's findings of fact and conclusions of law are incomplete and not based on the evidence presented at trial. * * *"

{¶ 46} Under this assignment of error, Northpoint argues that "the trial court committed reversible error in: A) refusing to pierce the corporate veil of Charter One; B) limiting its analysis and findings to EMG (the agent of Charter One and Thriftco) and contrary to the facts; C) not addressing the fact that Thriftco was undeniably the 'alter ego' of Charter One created for an improper purpose; and, D) refusing to award punitive damages."

---

[6] We note that *Amato v. Hohs* (Feb. 23, 1978), Cuyahoga App. No. 36948, relied on by Northpoint, is distinguishable from this case in that *Amato* did not involve a contractual jury waiver.

**{¶ 47}** Upon proper and timely request, a trial court in a bench trial is required to issue findings regarding all of the ultimate facts that are determinative of the case. *Freeman v. Westland Builders, Inc.* (1981), 2 Ohio App.3d 212, 214, 441 N.E.2d 283. "The purpose of separately stated findings of fact and conclusions of law is to enable a reviewing court to determine the existence of assigned error. If the [trial] court's ruling or opinion, together with other parts of the trial court's record, provides an adequate basis upon which an appellate court can decide the legal issues presented, there is * * * substantial compliance with Civ.R. 52." (Citations omitted.) *Abney v. W. Res. Mut. Cas. Co.* (1991), 76 Ohio App.3d 424, 431, 602 N.E.2d 348.

**{¶ 48}** In this case, the trial court made adequate findings of fact and conclusions of law on the dispositive issues for its decision in the case. We further recognize that the trial court extended its ruling to Charter One and Thriftco. Because we have an adequate basis upon which to decide the legal issues presented for review, we overrule Northpoint's third assignment of error. However, to the extent that these issues are necessary to the trial court's disposition of the case on remand, we recognize that these issues have not been determined herein.

**FRAUD**

**{¶ 49}** Finally, we address the sole assignment of error raised by appellees in their cross-appeal: "1. The trial court erred in finding that the

plaintiff proved liability for fraud as to a latent defect, even though the trial court reached the correct result by finding no evidence of cognizable damages."

{¶ 50} Under its cross-assignment of error, appellees argue that the trial court erred in finding they engaged in fraud as to latent defects in connection with the building's drinking-water system. In its reply brief and opposition to the cross-assignment of error, Northpoint interjects an argument that the trial court erred by failing to find fraud as to all defects in the fire-suppression and domestic-water systems. Although Northpoint has failed to comply with formal briefing requirements in presenting this argument, because the issues are related and we discern no prejudice, we shall exercise our discretion and consider the issue.

{¶ 51} An appellate court is to afford deference to a trial court's decision and "must not substitute its judgment for that of the trial court where there exists some competent and credible evidence supporting the findings of fact and conclusions of law rendered by the trial court." *Myers v. Garson*, 66 Ohio St.3d 610, 616, 1993-Ohio-9, 614 N.E.2d 742. However, we review application of the law to the facts de novo. *Pottmeyer v. Douglas*, Washington App. No. 10CA7, 2010-Ohio-5293, ¶ 21. Upon our review of the trial court's decision in this matter, we find that the trial court erred in its application of the doctrine of caveat emptor and that its findings against fraud were against the manifest

weight of the evidence.  We also conclude that the trial court's determination in favor of fraud was supported by competent, credible evidence.

{¶ 52} The doctrine of caveat emptor precludes claims related to property defects in real estate transactions when the following conditions apply: "(1) the defect must be open to observation or discoverable on reasonable inspection, (2) the purchaser must have an unimpeded opportunity to examine the property and (3) the vendor may not engage in fraud."  *Layman v. Binns* (1988), 35 Ohio St.3d 176, 177, 519 N.E.2d 642.  While a purchaser has a duty to make inquiry and examination, a seller "has a duty to disclose material facts which are latent [and] not readily observable or discoverable through a purchaser's reasonable inspection."  Id. at 178.

{¶ 53} Under the first part of the doctrine of caveat emptor, buyers are responsible for the discovery of patent defects that are observable and discoverable by an ordinarily prudent purchaser upon reasonable inspection. *Tipton v. Nuzum* (1992), 84 Ohio App.3d 33, 38, 616 N.E.2d 265.  "'A purchaser of real estate has the duty to use diligence in inspecting the property before buying it.  The principle of caveat emptor applies to sales of real estate relative to conditions open to observation where those conditions are discoverable and the purchaser has the opportunity for investigation and determination without concealment or hindrance by the vendor.'"  *Johnston v. Faith Baptist Church, Inc.* (Apr. 26, 1989), Allen App. No. 1-87-14, quoting 80

Ohio Jurisprudence 3d (1988), 46, Real Estate Sales and Exchanges, Section 27.

{¶ 54} Pursuant to the above, the relevant inquiry is whether the defects would have been discovered by an ordinarily prudent purchaser who has a duty to use diligence in inspecting the property. We find the trial court erred in applying an expert standard to this determination and finding defects found by Northpoint's expert were discoverable, non-latent defects.

{¶ 55} In this case, the defects found by plaintiff's expert were not discoverable by Dzina, an experienced real estate purchaser who went on two tours of the building and diligently viewed the basement of the building for over 20 minutes. Dzina looked at the steam system, water lines, and pressure gauges, which indicated sufficient water pressure.

{¶ 56} It took Northpoint's expert, Stojkov, three hours to locate the deficiencies with the aid of a blueprint. Moreover, the evidence reflects the basement was full of storage boxes that could have restricted the view of the absence of a water pump, a wall obstructed access to the tie-in and missing check valve, and the pressure gauges were pegged to give false readings. Although Dzina was aware that the fire-suppression system was being fed from the domestic-water system, he had no reason to know of the hidden, latent defects in these systems.

{¶ 57} While Northpoint did not obtain an independent property inspection before purchasing the building, "there is generally no need to hire an expert to inspect property." *Brenza v. Petruzzi*, Delaware App. No. 01CA-C10-047, 2002-Ohio-1835. However, "[o]nce alerted to a possible defect, * * * the buyer has a duty to either (1) make further inquiry of the owner, who is under a duty not to engage in fraud, *Layman*, 35 Ohio St.3d at 177, 519 N.E.2d at 643, or (2) seek the advice of someone with sufficient knowledge to appraise the defect." *Tipton*, 84 Ohio App.3d at 38.

{¶ 58} Dzina was aware of the advisement in the Brandstetter Report that "for [the fire hoses] to be effective, the water pressure should be verified." This observation pertained to the fire hoses, as to which the report stated: "It is questionable whether the fire department would want these to remain in service." Dzina responded to this by replacing the fire hoses. The advisement does not support a finding that a buyer would have been on notice of possible defects in the condition of the fire-suppression system.

{¶ 59} Thus, we find that the trial court's finding as to the non-latent nature of the defects was clearly erroneous. Additionally, as explained below, we find that the trial court's determination that Northpoint failed to prove fraud in regard to the fire-suppression system is against the manifest weight of the evidence.

{¶ 60} To establish a right to relief for a claim of fraudulent representation or concealment, a plaintiff must establish the following elements: "(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance." *Groob v. KeyBank*, 108 Ohio St.3d 348, 357, 2006-Ohio-1189, 843 N.E.2d 1170, quoting *Gaines v. Preterm-Cleveland Inc.* (1987), 33 Ohio St.3d 54, 55, 514 N.E.2d 709.

{¶ 61} In this case, appellees had knowledge of the Kaczmar Report recommendation that a fire-protection expert be obtained to "recommend changes to the sprinkler, standpipe, fire hose cabinet and fire pump system." This recommendation, coupled with EMG's awareness of the capped-off six-inch supply line, the tie-in of the domestic-water line, the absence of a fire pump, the inadequate water-pressure to the 15th floor, and the unpleasant taste of the drinking water, establish that the defendants had knowledge of problems with the fire-suppression and drinking-water systems. Despite their knowledge of these facts, they provided documents to Northpoint that made material misrepresentations as to the actual condition of these systems.

There was also evidence that although EMG was aware that the water gauge on the 15th floor had shown insufficient pressure, at the time Dzina viewed the property the pressure gauges had been pegged to show sufficient water pressure existed. Furthermore, given its knowledge of these problems and the complaints concerning the drinking water, EMG should have been aware of the contamination of the domestic water lines and it had reason to know that the water quality was not "safe." The evidence shows that the representations provided were made with the intent to induce reliance and that Northpoint's reliance on these representations was justified.

{¶ 62} Nonetheless, appellees argue that the building was sold in its "as is, where as" condition and they specifically disclaimed any representation of the building's condition. They also attempt to rely on the parol evidence rule. We find these arguments to be disingenuous.

{¶ 63} While an "as is" clause bars a claim for nondisclosure, it does not bar a claim of affirmative fraud, such as fraudulent concealment or misrepresentation. *Tipton*, 84 Ohio App.3d at 39. Likewise, the presence of a disclaimer does not necessarily shield a defendant from liability or mean that a plaintiff will not be able to demonstrate justifiable reliance. "Courts have long held that general disclaimers of accuracy do not shield sellers who knowingly make false statements." *In re Natl. Century Fin. Ent., Inc., Invest. Litigation* (S.D.Ohio 2007), 541 F.Supp.2d 986, 1005. Also, the parol evidence

rule does not exclude evidence of fraud that induced the written contract. *Galmish v. Cicchini*, 90 Ohio St.3d 22, 28, 2000-Ohio-7, 734 N.E.2d 782. We find these principles to be applicable in this matter.

{¶ 64} As to the final element of fraud, Northpoint established a resulting injury in that the building it purchased was other than represented and it incurred the cost to repair the defects as a result of the appellees' conduct. Thus, all of the elements of fraud were established.

{¶ 65} Upon our review, we find the doctrine of caveat emptor does not apply to preclude recovery in this case. We must reverse the court's determination against the fraud claim as being against the manifest weight of the evidence. Further, we find the trial court's findings in favor of the fraud claim were supported by competent credible evidence.

{¶ 66} Lastly, appellees raise a spoliation defense to the fraud claim. The spoliation defense is based on the claim that Northpoint conducted the repair and replacement work before giving notice to appellees of their claims and appellees were unable to examine or inspect the building before evidence relating to the condition of the water lines was destroyed. It has been recognized that "[e]ven prior to the commencement of any litigation, a plaintiff is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action." (Citations and quotations omitted.) *Loukinas v. Roto-Rooter Servs. Co.*, 167 Ohio App.3d 559, 2006-Ohio-3172, 855

N.E.2d 1272, ¶ 18. "[W]here evidence is intentionally or negligently spoiled or destroyed by a plaintiff or his expert before the defense has an opportunity to examine that evidence for alleged defects, a court may impose a sanction." *Holiday v. Ford Motor Co.*, Cuyahoga App. No. 86069, 2006-Ohio-284, ¶ 21. "'Although there is a rebuttable presumption that a defendant was prejudiced by the destruction of relevant evidence, a plaintiff can still persuade the court that there was no reasonable possibility that the defendant was prejudiced.'" Id. at ¶ 22, quoting *State Auto Ins. Cos. v. Troll*, Cuyahoga App. No. 84284, 2005-Ohio-877. Furthermore, spoliation of evidence generally does not warrant the extreme sanction of dismissal. Id.

{¶ 67} The record in this case clearly establishes fraud with respect to defective conditions that existed in the domestic water lines and fire-suppression system. We are unable to find that any spoliation of evidence that occurred during the repair and replacement work was of such a degree as to warrant a complete defense to the fraud claim. Therefore, we find no error by the trial court.

{¶ 68} For the above reasons, we overrule the cross-assignment of error, but sustain Northpoint's assertion of error regarding its fraud claim.

**CONCLUSION**

{¶ 69} In conclusion, we affirm the trial court's decision in rejecting the jury demands and proceeding to a bench trial. We further affirm the trial

court's findings in favor of the fraud claim, but reverse its judgment insofar as it ruled against the fraud claim. We also find the trial court committed reversible error as to the applicable measure of damages.

{¶ 70} Upon remand, the trial court must make a determination of reasonableness regarding the cost to repair. It is within the discretion of the court to make this determination upon the evidence presented, or to accept additional briefing or evidence regarding damages. Also on remand, the trial court shall determine, in the first instance, necessary unresolved issues as discussed under the third assignment of error.

Judgment affirmed in part, reversed in part; case remanded to the lower court for further proceedings consistent with this opinion.

It is ordered that appellant and appellees share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


SEAN C. GALLAGHER, JUDGE

MARY EILEEN KILBANE, A.J.,
PATRICIA ANN BLACKMON, J.,

MARY J. BOYLE, J.,
EILEEN A. GALLAGHER, J.,
LARRY A. JONES, J.,
KATHLEEN ANN KEOUGH, J.,
KENNETH A. ROCCO, J.,
MELODY J. STEWART, J., and
JAMES J. SWEENEY, J., CONCUR

FRANK D. CELEBREZZE, JR., J., RECUSED

COLLEEN CONWAY COONEY, J., CONCURS IN PART AND DISSENTS IN
PART WITH SEPARATE OPINION

COLLEEN CONWAY COONEY, J., CONCURRING IN PART AND DISSENTING IN
PART:

{¶ 71} I concur in the disposition of Assignment of Error No. I, the en banc issue, only.

Our charge as an en banc court does not include review of the remainder of the panel's

opinion that does not pose a conflict within our district. Therefore, I cannot concur in that

portion of the opinion that goes beyond the en banc application and our conference.