[Cite as *MADFAN, Inc. v. Makris*, 2016-Ohio-7395.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 103655**

---

## MADFAN, INC., ET AL.

PLAINTIFFS-APPELLEES

vs.

## DINO MAKRIS, ET AL.

DEFENDANTS-APPELLANTS

---

### JUDGMENT:
AFFIRMED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-11-749225

**BEFORE:** E.T. Gallagher, J., Kilbane, P.J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:** October 20, 2016

**ATTORNEY FOR APPELLANTS**

Michael F. Westerhaus
362 Arbour Garden Avenue
Las Vegas, Nevada 89148


**ATTORNEY FOR APPELLEES**

Michael J. Cheselka, Jr.
75 Public Square, Suite 920
Cleveland, Ohio 44113-2084

EILEEN T. GALLAGHER, J.:

**{¶1}** Defendant-appellant, attorney Michael Westerhaus ("Westerhaus"), appeals a judgment rendered after a jury verdict, finding him liable to plaintiffs-appellees, MADFAN, Inc., Alexander Stewart ("Alex"), Andrew Peloza ("Andrew"), Fred Cieslik ("Fred"), and Michael Allen ("Michael") (collectively "appellees"), on their complaint for fraud and conspiracy, in the amount of $300,000. Westerhaus raises the following four assignments of error:

> 1. The trial court erred by failing to grant appellant's motion for more definite statement and motion to dismiss so that appellant was not able to prepare for trial.
>
> 2. The verdict is not supported by the weight and sufficiency of the evidence and the court erred by not granting appellant's motion for directed verdict.
>
> 3. The trial court erred by failing to give the requested instruction as to the code of professional responsibility.
>
> 4. The trial court erred by failing to grant appellant's motion for judgment notwithstanding the verdict and/or for a new trial.

**{¶2}** We find no merit to the appeal, and affirm the trial court's judgment.

## I. Facts and Procedural History

**{¶3}** This case involves fraud and conspiracy claims against an attorney. Appellees alleged that Westerhaus prepared documents to create a corporation that ultimately failed because his long-time client stole money from the corporate business. Consequently, appellees filed a complaint against Westerhaus, Dino Makris ("Dino"), and his brother

Nick Makris ("Nick"), alleging fraud, conspiracy, conversion, and RICO and due process violations. Appellees also named some of Dino's other corporations, namely Olympic Investment Limited, Inc. ("Olympic Investment"), Pizza King Inc., and Buy Greek Islands, Inc., as defendants. In the prayer for relief, appellees sought compensatory and punitive damages.

{¶4} Prior to trial, Westerhaus filed a motion for a more definite statement, which was denied. Westerhaus subsequently filed a motion to dismiss the complaint for failure to state a claim upon which relief could be granted, which was also denied. Appellees dismissed the conversion, due process, and RICO claims before the jury returned its verdict and dismissed their claims against Nick because he passed away shortly after the complaint was filed. Thus, only appellees' common law fraud and conspiracy to commit fraud claims remained for trial.

{¶5} Appellees testified at trial that in 2002, Dino suggested to them that they open a restaurant together. By this time, Dino had an established attorney-client relationship with Westerhaus and owned other restaurants and businesses including Pizza King Inc., Buy Greek Islands, Inc., Jimmy's Pizza, and Olympic Investment. At Dino's direction, appellees and Dino met with Westerhaus at Westerhaus's home to discuss their business plan. They decided to form a corporation and call it MADFAN, Inc. ("MADFAN"). MADFAN is an acronym of the first letter of each shareholder's name, i.e., Michael, Alex, Dino, Fred, Andrew and Nick.

{¶6} In 2003, appellees and Dino returned to Westerhaus's home to sign articles of incorporation. Appellees each testified at trial that they witnessed Dino sign the articles of incorporation at the same time they themselves signed the document. However, Dino's signature does not appear in the articles that were later filed with the secretary of state. Appellees Alex, Andrew, Fred, and Michael each concluded from the witness stand that Dino's name must have been "whited out" sometime after their meeting at Westerhaus's home.

{¶7} Olympic Investment owned a dilapidated building on Pearl Road in Medina County. (Tr. 81.) The parties agreed to renovate the building to house their restaurant, which they called the Streetside Café. Appellees had no knowledge that Westerhaus owned 100 percent of the stock in Olympic Investment, in trust, for Nick and Dino's benefit. Dino was the president of Olympic Investment with full authority to act on behalf of the corporation.

{¶8} Westerhaus conceded at trial that Olympic Investment owned Dino's share of MADFAN, as opposed to Dino individually, because he was hiding from creditors. Westerhaus testified:

> Dino, he was a little shy, in terms of putting assets in his name. Okay. Just because he might have a creditor out there. So that's why he insisted on his shares going into Olympic Investment instead to his name personally.

(Tr. 178.)

{¶9} Appellees performed much of the labor to renovate the building themselves in order to save money. Alex described the work appellees performed on the building from 2002 through March 5, 2005, when the business opened its doors:

> We tore apart the whole building. We gutted the whole building. I mean, it was set up as a partial restaurant already. We tore down walls, the plumbing, the flooring. We — the basement was flooded, we had to pump it out.
>
> We had redone everything. Put in sump pumps, fixed the flooring, restructured the floor so it would hold up the weight, so to pass all the — I did go on the roof. Painting, siding, landscaping, driveway. Anything — everything in that building. The water main outside. I can't even remember everything else. Decorating, painting, going to auctions.

(Tr. 118.) Alex, Fred, and Michael had full time jobs and contributed as much time as they could to the renovations. For Andrew, however, the new business was his full-time job. In describing the work he performed on the building prior to opening, Andrew testified:

> I was probably there more than anybody. * * * I had to be there every time, you know, an electrician showed up, a plumber, to open the doors for them. I did a lot of work inside, painting, staining, tearing down, gutting it out, outside work.

(Tr. 85.)

{¶10} Westerhaus prepared all the corporate documents for MADFAN. In May 2004, appellees again met in Westerhaus's home and signed a "Subscription Agreement and Investment Letter," reflecting the amount of each shareholder's capital contribution to the new corporation. Appellees collectively invested $87,000. Another document titled "Meeting of the Directors of MADFAN, Inc." showed the amounts each

shareholder later loaned to the corporation in 2007. Appellees collectively loaned $41,500 to MADFAN. Thus, appellees invested a total of $128,500, in cash, into the corporation.

{¶11} Streetside Café opened in March 2005 and was very busy. Andrew worked between 80 and 100 hours per week, performing the day-to-day operations. He testified that the business "did double the sales we projected." However in 2010, Andrew informed his partners that he had to quit working as the manager because he was not getting paid, and he needed to make a living. As the manager, he was supposed to receive a salary in addition to his share of the profits, but Andrew had a "hard time collecting most of the time, because Dino, who was corporate treasurer and CEO, kept saying how much * * * the rent was behind, [and] the property taxes were behind." (Tr. 108.)

{¶12} In 2007, while Dino was in Greece for an extended period of time, Andrew reviewed the corporate finances and discovered that Dino was purchasing food for Pizza King Inc. on MADFAN's account. Dino was also personally charging MADFAN "consulting fees," and Olympic Investment was charging double the rent each month to pay an arrearage. (Tr. 108-109.) Andrew explained:

> [I]t was pretty much Dino and I were arguing because I didn't understand where all the money was. We did so well, and there was no money in the business. We had no business going out of business.

(Tr. 99.)

{¶13} Andrew stopped working at Streetside Café in January 2010, and the restaurant closed in August 2010. Westerhaus testified that the health department shut it down because the coolers were not cold enough. However, appellees also lost their liquor license because Dino failed to pay state taxes. Andrew had signed personal guarantees on contracts with MADFAN's food vendors, and in November 2010, Northern Haserot sued him personally because its bills were not paid.

{¶14} Westerhaus, who represented himself, testified at trial. Appellees' theory against Westerhaus was that he knew Dino deceived numerous creditors before forming MADFAN but nevertheless formed MADFAN knowing appellees would invest large sums of money in it. Appellees claimed that each time one of Dino's other corporations was sued, Westerhaus created a new corporation that allowed Dino to reinvent himself and hide from creditors.

{¶15} Westerhaus claimed that although he was the statutory agent for all of Dino's corporations, he had no knowledge that Dino's corporations had been sued. However, he later acknowledged that he defended Dino in at least one lawsuit brought by a creditor. (Tr. 145.) Westerhaus also admitted that he changed the names of Dino's corporations to hide from creditors and to obtain new accounts with new vendors and investors. (Tr. 148-149.)

{¶16} As previously stated, Dino's signature was absent from the articles of incorporation that was filed with the secretary of state even though appellees each separately testified that they witnessed him sign the articles at Westerhaus's house.

Appellees argued that Westerhaus removed Dino's name from the articles in order to hide Dino from prospective vendors, who would not do business with MADFAN if they knew Dino was involved with it. Westerhaus denied that he removed Dino's name from the articles of incorporation. He claimed Dino was not present when appellees signed the articles of incorporation.

{¶17} Westerhaus further conceded that he drafted the lease by which MADFAN leased the property for the Streetside Café. None of the appellees signed the lease, nor did they have knowledge of it. Dino simultaneously signed the lease on behalf of both Olympic Investment, the lessor, and MADFAN, the lessee, in 2003, nearly two years before Streetside Café opened for business. (Tr. 152.) Indeed, Westerhaus notarized Dino's signatures on the lease. Consequently, MADFAN was indebted to Olympic Investment in the amount of $65,000 before it ever opened for business.

{¶18} Westerhaus testified to the jury that he did not disclose Dino's poor credit history to appellees before forming MADFAN because Dino was his client and his ethical duty of loyalty to his client prohibited him from disclosing Dino's "embarrassing" secrets. (Tr. 185.) Westerhaus further told the jury that once MADFAN was formed, he became MADFAN's corporate attorney, and his loyalty was to the corporation, not to any particular shareholder or officer. When asked whether Westerhaus informed anyone at MADFAN that they were being sued, he replied "I represent MADFAN. I deal with the president." (Tr. 201.) He did not inform appellees that MADFAN was being sued for unpaid bills.

**{¶19}** At the conclusion of the evidence, the court charged the jury on two counts (1) fraud, and (2) conspiracy to commit fraud. With respect to each count, the court instructed the jury on damages, in relevant part, as follows:

> If you find for the plaintiffs, you will decide from the greater weight of the evidence what amount of money would reasonably compensate them for the actual damage directly caused by the [fraud or conspiracy].

**{¶20}** The jury returned a general verdict in favor of appellees and against Westerhaus in the amount of $300,000. Neither party requested jury interrogatories. After the jury returned the verdict, appellees dismissed their punitive damages claim. Westerhaus now appeals the trial court's judgment.

## II. Law and Analysis

### A. Motion for a More Definite Statement and Motion to Dismiss

**{¶21}** In the first assignment of error, Westerhaus argues the trial court erred in denying his motion for a more definite statement and to dismiss. He contends that because the complaint was "unintelligible," he was unable to adequately prepare for trial. We discuss these arguments together because they are closely related.

**{¶22}** Under the notice pleading requirements of Civ.R. 8(A)(1), a plaintiff is only required to plead sufficient, operative facts to support recovery under the alleged claims. *Dottore v. Vorys, Sater, Seymour & Pease, L.L.P.*, 8th Dist. Cuyahoga No. 98861, 2014-Ohio-25, ¶ 119. However, fraud claims must be pled with specificity. Civ.R. 9(B). The circumstances constituting fraud must "be stated with particularity." *Id.*

**{¶23}** When reviewing a Civ.R. 12(B)(6) motion to dismiss, we must accept the material allegations of the complaint as true and make all reasonable inferences in favor of the plaintiff. *Johnson v. Microsoft Corp.*, 106 Ohio St.3d 278, 2005-Ohio-4985, 834 N.E.2d 791, ¶ 6. To prevail on the motion, it must appear from the face of the complaint that the plaintiff can prove no set of facts that would justify a court granting relief. *O'Brien v. Univ. Comm. Tenants Union, Inc.*, 42 Ohio St.2d 242, 245, 327 N.E.2d 753 (1975).

**{¶24}** To prove fraud, a plaintiff must demonstrate (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation; and (6) a resulting injury proximately caused by the reliance. *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 475, 700 N.E.2d 859 (1998).

**{¶25}** "'Civil conspiracy' has been defined as 'a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.'" *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 650 N.E.2d 863 (1995), paragraph two of syllabus, quoting *LeFort v. Century 21-Maitland Realty Co.*, 32 Ohio St.3d 121, 126, 512 N.E.2d 640 (1987),

**{¶26}** The complaint in this case provides specific allegations of fraud and conspiracy to commit to fraud. According to the second amended complaint,

Westerhaus prepared the corporate documents that formed MADFAN for Dino and appellees, knowing that Dino had previously deceived co-investors and creditors involved with some of his other restaurants. The complaint also describes, in detail, the labor appellees personally performed to rehabilitate the building prior to opening the restaurant, and estimates that MADFAN's first year gross receipts totaled over $1,000,000, but alleges appellees did not receive their share of the profits because Dino stole them.

{¶27} In particular, the second amended complaint alleges that Dino took cash from MADFAN and applied it to his other businesses. The businesses are specifically identified by name. (Second amended complaint ¶ 31-37.) The second amended complaint also alleges that Dino, "aided and abetted by Michael Westerhaus, * * * misappropriat[ed] * * * materials and food products that belonged to MADFAN and directed and applied [them] to the myriad of other business interests which benefitted Dino Makris and/or Michael Westerhaus."

{¶28} According to the complaint, Westerhaus maintained custody of MADFAN's corporate records and some of the records were falsified to conceal Dino's misdealings. (Second amended complaint ¶ 38-44, 47.) The complaint further states that certain accountants were employed to "cook the books." Under the fraud count, the second amended complaint alleges, in relevant part:

72. The Defendants in this case did willfully entice, deceive, mislead, and steal the assets, sweat equity, cash, credit ratings and good names of Plaintiffs.

73. Makris' track record was known to Westerhaus as he had counseled his co-Defendant out of similar situations on more than one prior occasion.

74. Westerhaus maintained financial interests in more than one of his client's business interests.

75. Defendants engaged in cover-up activities after Olympic Investment Limited was canceled by the state of Ohio.

76. Defendants misapplied "Madfan" revenue to other of their varied business interests.

&#42;   &#42;   &#42;

80. Defendants used Streetside Café as a cash cow for their other varied business interests from its inception.

81. Defendants co-mingled funds from Streetside Café and his disclosure of same from "Madfan."

These allegations are specific and describe the circumstances of the fraud with particularity. Therefore, a more definite statement was not necessary. Moreover, the allegations state claims for both fraud and conspiracy. Therefore, the trial court properly denied Westerhaus's motion for a more definite statement and motion to dismiss for failure to state a claim upon which relief might be granted.

{¶29} The first assignment of error is overruled.

## B. Sufficiency and Weight of the Evidence

{¶30} In the second assignment of error, Westerhaus argues the jury's verdict finding him liable for fraud in the amount of $300,000 was against the manifest weight of the evidence and was not supported by sufficient evidence. He contends the court should have granted his motion for directed verdict.

## 1. Fraud

{¶31} As previously set forth above, in order to prove fraud, a plaintiff must establish (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation; and (6) a resulting injury proximately caused by the reliance. *Aetna Fin. Co.*, 83 Ohio St.3d 464 at 475, 700 N.E.2d 859. Westerhaus argues there was no evidence as to any of these fraud elements. He contends appellees erroneously persuaded the jury to presume fraud because Westerhaus failed to disclose Dino's true character to them before they went into business with him. Indeed, appellees' counsel stated in closing argument: "When the judge reads you the definitions, you'll find out fraud doesn't have to be an overt act, it can also be an act of omission. It's not just words that come out of your mouth; it's the words that don't come out of your mouth. And that's what happened here."

{¶32} Counsel's definition of fraud is not an accurate statement of the law because to establish fraud, the plaintiff must prove that the defendant made a false representation that is material to the transaction at issue. *Id*. Nevertheless, the charge provided the jury with a proper instruction on the law of fraud and juries are presumed to follow the court's jury instructions. *Pang v. Minch*, 53 Ohio St.3d 186, 559 N.E.2d 1313 (1990), paragraph four of the syllabus.

{¶33} The evidence adduced at trial established the elements of appellees' fraud and conspiracy claims. Appellees came to Westerhaus's home seeking his counsel in the formation of MADFAN. Thus, despite Westerhaus's statements to the contrary, they were his clients. The Ohio Supreme Court has held that "an attorney-client relationship need not be formed by an express written contract or by the full payment of a retainer." *Cuyahoga Cty. Bar Assn. v. Hardiman*, 100 Ohio St.3d 260, 2003-Ohio-5596, 798 N.E.2d 369, ¶ 8. "Instead, * * * an attorney-client relationship may be created by implication based upon the conduct of the parties and the reasonable expectations of the persons seeking representation." *Id*. Furthermore, "[t]he client rightfully looks upon the attorney as legal advisor, one who will act in the client's best interests." *Office of Disciplinary Counsel v. Moore*, 101 Ohio St.3d 261, 2004-Ohio-734, 804 N.E.2d 423, ¶ 14.

{¶34} Westerhaus's act of creating the corporate documents and facilitating their execution was a representation to appellees that their investments in MADFAN were in their best interests. Westerhaus created individual subscription agreements for each shareholder representing his ownership of shares in the corporation. These documents likely gave appellees a false sense of security because they "owned" something. Therefore, the formation of the corporation and the creation of corporate documents constituted a "material representation" that the formation of the corporation served appellees' interests. Under these circumstances, appellees reasonably relied on their attorney's apparent approval of their corporate venture.

**{¶35}** Although we have no direct evidence of Westerhaus's intent to defraud appellees, his drafting of the lease and notarization of Dino's signatures as both lessor and lessee, without appellees' knowledge, creates an inference that he conspired with Dino to commit fraud. Indeed, MADFAN's landlord was Olympic Investment, which was entirely owned by Westerhaus, albeit for the benefit of Dino, its president. Therefore, the jury's findings of fraud and conspiracy are supported by sufficient evidence and by the weight of the evidence.

## 2. Damages

**{¶36}** Westerhaus argues there was no evidence of damages because there was no evidence as to what appellees' shares were worth at the time of trial. He contends that because appellees never tried to sell their shares in MADFAN, there was no evidence of a diminution in the value of the shares, and therefore no evidence of damage.

**{¶37}** However, there was evidence that (1) Andrew was not getting paid his salary "most of the time," (2) none of the shareholders were receiving their share of the profits, (3) Olympic Investment was charging back rent for a two-year arrearage, pursuant to a lease that was executed without appellees's knowledge, (4) Dino was paying himself "consulting fees," and (5) Dino was caught purchasing food for one of his other restaurants on MADFAN's account. Indeed, Andrew testified "there was no money in the business." (Tr. 99.)

**{¶38}** Juries are expected to apply common sense and general knowledge in drawing reasonable inferences from the evidence at trial. *United States v. Diabate*, 317

Fed. Appx. 638, 639 (9th Cir. Nov. 21, 2008). Based on this evidence, a jury could reasonably infer that appellees' shares in MADFAN had no value when Streetside Café went out of business. The company was insolvent. Not even the taxes were paid, and MADFAN's creditors were pursuing Andrew personally to satisfy MADFAN's debts.

{¶39} In the charge, the court instructed the jury that "[t]he measure of damages is the difference between the represented value and the actual value at the time of the transaction." Value of what? What transaction? The court did not instruct the jury to consider the difference between the represented value of MADFAN shares, the true value of those shares at the time of the transaction, or the value of the shares at the time of trial. Without additional information regarding stock valuation and transaction dates, this instruction was nonsensical.

{¶40} Westerhaus did not object to this ambiguous instruction. Errors arising during the course of trial that are not brought to the attention of the court by objection or otherwise are waived and may not be raised on appeal. *State v. Williams*, 51 Ohio St.2d 112, 364 N.E.2d 1364 (1977), paragraph one of the syllabus. Therefore, Westerhaus forfeited his argument on appeal that damages should be measured by the difference between the value of the shares at the time of trial and the value of the shares at the time of purchase. *McQueen v. Greulich*, 8th Dist. Cuyahoga No. 100544, 2014-Ohio-3714, ¶ 20 ("[I]n order to preserve the right to appeal the giving or failure to give an instruction, a party must object to the instruction."). Furthermore, as previously stated, appellees did

not allege a securities fraud claim under R.C. 1707.43. They alleged common law tort claims for fraud and conspiracy to commit fraud.

**{¶41}** Nevertheless, the court's failure to instruct the jury to consider the value of MADFAN stock on various dates was harmless since the court properly instructed the jury on the law of damages for fraud and conspiracy to commit fraud. Regarding conspiracy to commit fraud, the court charged the jury, in relevant part:

> Damages for civil conspiracy. If you find for the plaintiffs, you will decide from the greater weight of the evidence what amount of money would reasonably compensate them for the actual damages directly caused by [the] conspiracy.

(Tr. 260.) Regarding damages for fraud, the court instructed the jury, in relevant part:

> Damages for fraud. If you find for the plaintiffs * * * you will decide from the greater weight of the evidence what amount of money will reasonably compensate them for the actual damage caused by the fraud.

(Tr. 257-258.)

**{¶42}** The Restatement 2d, Torts, Section 549 (1977) sets forth the measure of damages for fraud, and states, in relevant part:

> (1) The recipient of a fraudulent misrepresentation is entitled to recover as damages in action of deceit against the maker the pecuniary loss to him of which the misrepresentation is a legal cause including
>
> (a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and
> (b) *pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation.*

(Emphasis added.) Thus, damages for fraud are not limited to the difference between a represented price and the actual value of the item at the time of the transaction; they

include other pecuniary loss suffered as a result of the defendant's deceit. Indeed, the comment to Restatement 2d Torts, Section 549(1) describes two forms of damages. Subsection (1)(a) defines damages as a difference between the represented value of an item and its true value at the time of the transaction. The measure of damages in this scenario does not involve a diminution of value over a period of time. Specifically, the comment on subsection (1) states:

> Loss may result from a recipient's reliance upon a fraudulent misrepresentation in a business transaction in one of several ways. The most usual is when the falsity of the representation causes the article bought, sold or exchanged to be regarded as of greater or less value than that which it would be regarded as having if the truth were known. The rule applicable in this situation is that stated in Clause (a). * * *
>
> Loss that may be suffered in reliance upon a fraudulent misrepresentation otherwise than as stated in Clause (a) includes two types of situations both of which the rule stated in Clause (b) applies.

{¶43} The second of the two situations described in the comment is relevant here. The comment describes this situation as follows:

> A second situation in which loss may be sustained otherwise than through difference in value as stated in Clause (a) is when a buyer, in reliance upon a misrepresentation, uses the subject matter of the sale in the belief that it is appropriate for a use * * * when he has incurred expenses in preparation for use of the article for which it would have been appropriate if the representation had been true. In these latter situations the loss depends upon the particular use to which the plaintiff puts the article and is not inherent in the nature of the transaction and the damages are often called special or consequential damages.

{¶44} Appellees' claims were not pleaded or tried as alleged misrepresented stock prices. Their claims were based on damages resulting from their reasonable reliance on a fraudulent misrepresentation. The jury, who is expected to apply common sense, likely,

and reasonably, disregarded the nonsensical "measure of damages" instruction in favor of the instruction on consequential damages. *Cleveland v. Thorne*, 8th Dist. Cuyahoga Nos. 98365, 98474, 98503, 98695, 98696, and 98697, 2013-Ohio-1029, ¶ 24 (Jury instructions should be viewed from a common sense perspective.); *Day-Glo Color Corp. v. Brewer-Garrett Co.*, 8th Dist. Cuyahoga No. 87838, 2007-Ohio-159, ¶ 25 (S. Gallagher, J., dissenting)(expectation that jury will use common sense.)

**{¶45}** A plaintiff must prove damages with "reasonable certainty" rather than speculation or conjecture. *Marzullo v. J.D. Pavement Maintenance*, 8th Dist. Cuyahoga No. 96221, 2011-Ohio-6261, ¶ 31. However, the plaintiff need not establish proof of damages with mathematical certainty as long as there is evidence upon which to make a "reasonable estimate."

**{¶46}** The jury awarded appellees $300,000. Appellees sought, among other things, to recover the amounts of their initial investments and unsecured loans to MADFAN, which totaled $128,500. Each appellee testified as to the amount of his individual investment and, based on their testimony, they collectively invested $128,500 in MADFAN. They lost these sums when MADFAN went out of business. Therefore, the amount of $128,500 in damages is supported by competent, credible evidence.

**{¶47}** Appellees also sought to recover damages for unpaid salaries as well as the time and labor they invested in the business. Appellees testified that they gutted the building owned by Olympic Investment, and rebuilt it from the bottom up, including the installation of floor joists, walls, and ceilings. They installed a new roof, a new

driveway, and landscaping. The construction took over two years to complete. Additionally, Andrew testified that after the business opened, he worked 80-100 hours her per week and was not paid "most of the time." (Tr. 107.) Unfortunately, appellees failed to provide specific details regarding the number of hours they worked, an applicable hourly rate of compensation, or the amount of Andrew's unpaid salary. Without this data it is impossible to calculate the amount of economic loss associated with these efforts to any degree of reasonable certainty.

{¶48} Nevertheless, noneconomic damages may be awarded in tort cases pursuant to R.C. 2315.18(A)(4). R.C. 2315.18(A)(4) defines "noneconomic damages" in part as

> nonpecuniary harm that results from an injury or loss to person or property that is a subject of a tort action, including, but not limited to, pain and suffering, loss of society, consortium, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, or education, disfigurement, mental anguish, and any other intangible loss.

{¶49} The phrase "any other intangible loss" has been interpreted to include "inconvenience, aggravation, frustration, humiliation, and mental distress." *Favors v. Burke*, 8th Dist. Cuyahoga No. 98617, 2013-Ohio-823, ¶ 7, citing *Whitaker v. M.T. Automotive, Inc.*, 111 Ohio St.3d 177, 2006-Ohio-5481, 855 N.E.2d 825, ¶ 21-22. Courts have held that this interpretation of noneconomic damages "is consistent with the general tort definition set forth in R.C. 2315.18(A)(4) and is sometimes referred to as damages for pain and suffering." *Id.*, citing *Whitaker* at ¶ 19.

**{¶50}** Further, noneconomic damages are included in general damages and need not be specifically pleaded. *Robb v. Lincoln Publishing (Ohio) Inc.*, 114 Ohio App.3d 595, 683 N.E.2d 823 (12th Dist.1996) (general damages are presumed to flow from injury); *Baker v. Cleveland*, 8th Dist. Cuyahoga No. 93952, 2010-Ohio-5588, ¶ 46 (general damages include economic and noneconomic damages). Therefore, appellees were not required to make a separate claim for noneconomic damages in order to recover them.

**{¶51}** "[T]he assessment of damages is so thoroughly within the province of the jury that a reviewing court is not at liberty to disturb the jury's assessment absent an affirmative finding of passion and prejudice or a finding that the award is manifestly excessive." *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638, 655, 635 N.E.2d 331 (1994).

**{¶52}** The jury heard all the evidence regarding appellees' endeavors to make their business a success, both physical and mental. Appellees spent countless hours rehabilitating the building. And there was evidence that the business was successful, or at least provided a reasonable expectation of success. Andrew testified they "did double the sales [they] projected." Yet MADFAN was doomed from the start, in part because, unbeknownst to appellees, MADFAN was indebted to Olympic Investment for two years of unpaid rent before the restaurant opened for business. The jury also heard evidence that even though Westerhaus knew of Dino's history of stealing from creditors and investors, he set appellees up in business with him.

**{¶53}** If the business had simply failed due to market forces, appellees would have undoubtedly been disappointed. But appellees suffered more than disappointment. Andrew quit his job to work full time for MADFAN. The evidence showed that appellees invested their time, money, and souls in the business only to discover that their friend and partner, Dino, and their trusted counsel, Westerhaus, worked against them from the very beginning. The jury heard each plaintiff describe how their hopes, enthusiasm, and hard work were dashed by squandering and betrayal. Any ordinary, reasonable person would understand the anger, frustration, and aggravation the appellees must have felt when the fraud and conspiracy were uncovered. The jury's verdict reasonably includes an award of noneconomic damages to compensate appellees for this "intangible loss."

**{¶54}** It is possible that the jury erroneously awarded damages for appellees' physical labor and unpaid salaries instead of limiting the award to damages for loss of capital and noneconomic damages. But we have no way to determine if any portion of the verdict was awarded in error because Westerhaus did not to submit interrogatories to the jury. Jury interrogatories test the correctness of the general verdict by asking the jury to disclose its opinion on the determinative issues in a case, including damages, based upon the trial evidence. *Freeman v. Norfolk & W. Ry. Co.*, 69 Ohio St.3d 611, 613-614, 635 N.E.2d 310 (1994). An untested jury verdict on the issue of damages is construed in favor of the successful party. *Bobb Forest Prod., Inc. v. Morbark Industries, Inc.,* 151 Ohio App.3d 63, 2002-Ohio-5370, 783 N.E.2d 560 (7th Dist.).

{¶55} As previously stated, there was competent, credible evidence that appellees invested $128,500 in cash in MADFAN and that they lost these sums when the corporation became insolvent. The jury's award of $175,000 above the amount of money appellees paid into MADFAN is not manifestly excessive when one considers how much appellees mentally invested in the doomed corporation and the frustration and aggravation they experienced as a result of the defendants' deceit and betrayal. The jury's verdict was not the product of passion or prejudice, nor was it manifestly excessive based on the evidence.

{¶56} Therefore, the second assignment of error is overruled.

### C. Jury Instruction

{¶57} In the third assignment of error, Westerhaus argues the trial court erred by failing to instruct the jury on the professional rules regarding attorney-client privilege and confidentiality. He asserts the attorney-client privilege as a defense to explain why he did not disclose Dino's deceitful character to appellees before they invested in MADFAN. However, appellees were Westerhaus's clients too. *See Hardiman*, 100 Ohio St.3d 260, 2003-Ohio-5596, 798 N.E.2d 369, ¶ 8.

{¶58} Appellees sought Westerhaus's legal counsel in the formation of a corporation, and they reasonably believed Westerhaus was their lawyer acting in their best interests. The fact that Dino was already Westerhaus's client did not change that fact; it merely created a conflict of interest for Westerhaus.

**{¶59}** The fact that Westerhaus and Dino had an attorney-client relationship did not excuse Westerhaus's misconduct vis-a-vis appellees, who were also his clients. Therefore, an instruction regarding attorney-client privilege would have been confusing and misleading. Moreover, if an instruction on attorney-client privilege were given, it would only be fair to instruct the jury on how the attorney-client relationship is formed, the reasonable expectations of the client, and the ethical rules regarding conflicts of interest.

**{¶60}** Appellate courts review the trial court's refusal to give a requested jury instruction for an abuse of discretion. *Harris v. Noveon, Inc.*, 8th Dist. Cuyahoga No. 93122, 2010-Ohio-674, ¶ 20. The decision not to give such an instruction on attorney-client privilege was not an abuse of discretion under the facts of this case.

**{¶61}** Therefore, the third assignment of error should be overruled.

### D. JNOV and/or a New Trial

**{¶62}** In the fourth assignment of error, Westerhaus argues the trial court should have granted his motion for judgment notwithstanding the verdict ("JNOV"), or in the alternative, for a new trial, because (1) appellees' counsel argued facts not in evidence in closing argument, (2) appellees' counsel committed misconduct in closing argument, (3) the verdict was given under the influence of passion or prejudice, and (4) the verdict was contrary to law.

### 1. JNOV

{¶63} Appellate review of a trial court's ruling on a motion for JNOV is de novo. *C4 Polymers, Inc. v. Huntington Natl. Bank*, 8th Dist. Cuyahoga No. 102142, 2015-Ohio-3475, ¶ 45. The standard for ruling on a motion for judgment notwithstanding the verdict is the same test applied to a motion for a directed verdict. *Id.* Civ.R. 50(A)(4) sets forth the standard for granting a motion for a directed verdict and a motion for JNOV:

> When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.

Neither the weight of the evidence nor the credibility of the witnesses is to be considered in ruling on these motions. *Posin v. A.B.C. Motor Court Hotel, Inc.*, 45 Ohio St.2d 271, 275, 344 N.E.2d 334 (1976). JNOV is appropriate if the nonmoving party failed to present any evidence on one or more of the essential elements of a claim. *Id.* JNOV should be denied, however, if there exists evidence on which reasonable minds may reach differing conclusions. *Id.*

{¶64} The trial court properly denied Westerhaus's motion for JNOV. There was evidence that reasonable minds could reach differing conclusions that Westerhaus prepared corporate documents to create MADFAN knowing that Dino would convert money from the corporation to fund his other ventures. The evidence that Westerhaus created a lease for the Steetside Café two years before it opened and notarized Dino's signatures as both landlord and tenant on the lease supports appellees' fraud and

conspiracy claims. Westerhaus, who claims his loyalty was solely to the corporation, burdened the corporation with substantial debt before it even opened for business. Under these circumstances, the trial court properly overruled Westerhaus's motion for JNOV.

## 2. New Trial

{¶65} Appellate courts review a trial court's judgment on a Civ.R. 59 motion for a new trial under the abuse of discretion standard. *Rybak v. Main Sail, L.L.C.*, 8th Dist. Cuyahoga No. 96899, 2012-Ohio-2298, ¶ 50. Civ.R. 59(A) provides, in relevant part, that a new trial may be granted on the following grounds:

(2) Misconduct of the jury or prevailing party;

\* \* \*

(4) Excessive or inadequate damages, appearing to have been given under the influence of passion or prejudice;

\* \* \*

(6) The judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case;

(7) The judgment is contrary to law;

\* \* \*

In addition to the above grounds, a new trial may also be granted in the sound discretion of the court for good cause shown.

{¶66} As previously stated, Westerhaus contends he was entitled to a new trial under Civ.R. 59(A) because (1) appellees' counsel argued facts not in evidence in closing

argument, (2) appellees' counsel committed misconduct in closing argument, (3) the verdict was given under the influence of passion or prejudice, and (4) the verdict was contrary to law.

## a. Closing Argument

{¶67} Westerhaus argues appellees' counsel improperly argued facts not in evidence. He also complains that appellees's counsel misstated the law pertaining to statutory agents. Specifically, Westerhaus complains about the following statements in closing argument:

> What we have claimed from the beginning — and the Judge will give you the instruction and all the definitions of law — is that there is a conspiracy to commit fraud with regard to what transpired between Mr. Westerhaus, Dino Makris, all the other defendants that didn't show up, that are still hiding from you, that the deception continues.
>
> \*    \*    \*
>
> And that's what happened here, because going way back into the 90's — 20 years — 10 to 20 years before this fraud, Mr. Westerhaus, Dino Makris, Nick Makris, and all these business entities, Makris Brothers, Papa Jim's, Pizza King, Mama Stamatia's, Olympic Investments, Buy Greek Islands, Berea Pizza King, MADFAN, NALD, and others, were created over and over and over again on behalf of Nick or Dino, or some combination thereof.

(Tr. 221-223.)

{¶68} Normally, counsel is afforded great latitude in the presentation of closing argument to the jury. *Minch*, 53 Ohio St.3d 186, 194, 559 N.E.2d 1313 (1990). In this case, Westerhaus failed to object to any of the statements with which he now takes issue. A party must raise a timely objection to preserve a claim of error. *Villella v. Waikem*

*Motors, Inc.*, 45 Ohio St.3d 36, 39-40, 543 N.E.2d 464 (1989). Therefore, failure to object in closing arguments prevents reversal absent gross and persistent abuse of counsel's privilege in closing argument. *Snyder v. Stanford*, 15 Ohio St.2d 31, 238 N.E.2d 563 (1968).

{¶69} Despite Westerhaus's argument to the contrary, there was evidence that Westerhaus knew Dino's other corporations had been sued by creditors on more than one prior occasion. Westerhaus testified, in relevant part:

> Q: In 1992, you had to defend Makris Brothers Management, Nick Makris, and Dino Makris, in a lawsuit brought by Cleveland Imported Groceries and Wine, known as Zannoni's, correct?
>
> A: That could be correct.
>
> *     *     *
>
> Q: Have you known since 1992 that Dino and Nick, before he passed, owed that company $40,000?
>
> A: One of the companies we settled by doing mortgages; I think that was
>
> the one.

{¶70} There was also evidence throughout the entirety of the trial suggesting that Westerhaus created new corporations for Dino in order to evade creditors. Although Westerhaus denied these allegations, he admitted doing so on at least one occasion:

> Q: Isn't it true that you kept changing names of the corporation for Dino, so that he could continue to run up all these debts, and screw all these creditors, and investors, and then reinvent himself with a clean name and a clean slate over and over and over again?
>
> A: There is some truth to that, for the Pizza King in Berea.
>
> Q: Again ----

A: I did change the name, and we bought assets and started another corporation.

Therefore, Westerhaus's claim that counsel argued facts not in evidence is not supported by the record.

{¶71} Westerhaus also complains about the following comment regarding statutory agents:

The common denominator through this is Mr. Westerhaus. And every single time one of these business entities got sued, Mr. Westerhaus, in most of these cases and especially here, was the statutory agent.

And you heard Mr. Westerhaus say, well, sometimes the statutory agent doesn't get served. Ladies and gentlemen, the statutory agent of a corporation is designed to be the person that does get served. That's the person who gets notice when you don't pay your taxes, when you're about to lose your liquor license, when you've been sued.

And so knowing full well that Nick, Dino, or any combination of these business entities were sued over and over and over and over again, by Zannoni's, by Hillcrest Egg, by Peck Distributors, by RDP Food Services, by the Ohio Department of Taxation, and later on by the woman who owned the building that Dino claimed that they could open MADFAN and Streetside in, Mr. Westerhaus was aware of this.

{¶72} Westerhaus argues appellees' counsel falsely instructed the jury that a corporation's statutory agent is always served with the complaint when the corporation is sued. However, Westerhaus mischaracterizes counsel's statements. Counsel did not tell the jury that statutory agents are always served. He told the jury that the statutory agent "is designed to the be person that gets served." In other words, although statutory agents are available to be served with process, service could nevertheless be obtained on some other agent of the corporation. Thus, Westerhaus's claim that he had no notice of

any lawsuits could be true according to counsel's instruction. Therefore, the comment was not unfairly prejudicial.

**{¶73}** Moreover, counsel's statement regarding statutory agents is an accurate statement of the law. R.C. 1701.07 provides that every corporation is required to maintain a statutory agent upon whom "any process, notice, or demand * * * may be served." Therefore, none of counsel's statements regarding statutory agents were improper.

### b. Passion or Prejudice

**{¶74}** Westerhaus contends he was entitled to a new trial because the jury verdict was the result of passion or prejudice. Westerhaus contends appellees' references to Dino as "Dracula" and "a thief" inflamed the jury.

**{¶75}** In determining whether a verdict was influenced by passion or prejudice, the court should consider the amount of damages returned and whether the record discloses that the verdict was induced by "'(a) admission of incompetent evidence, (b) misconduct on the part of the court or counsel, or (c) by any other action occurring during the course of the trial which can reasonably be said to have swayed the jury in their determination of the amount of damages that should be awarded.'" *Banas v. Shively*, 8th Dist. Cuyahoga No. 96226, 2011-Ohio-5257, ¶ 44, quoting *Fromson & Davis Co. v. Reider*, 127 Ohio St. 564, 569, 189 N.E. 851 (1934).

**{¶76}** In addition to calling Dino a "thief," counsel stated during closing argument:

And I told you in my opening statement, if your client is Dracula, and you keep bringing people into the room, and leaving, you can't walk in the room later and go, oh, my goodness, they've been sucked dry, what a surprise.

**{¶77}** There was substantial evidence at trial establishing that Dino was a thief and "sucked" funds out of MADFAN for his own personal use. These characterizations were firmly supported by the record. Therefore, they were not unfairly prejudicial.

**{¶78}** Furthermore, Dino's thievery is irrelevant to the jury in Westerhaus's trial[1] unless Westerhaus knowingly participated and assisted in it. The jury would not blame Dino's attorney for stealing unless his attorney was guilty of participation. Therefore, the references to Dracula and a "thief" did not unfairly prejudice Westerhaus.

### c. Verdict Contrary to Law

**{¶79}** Finally, Westerhaus argues the judgment is contrary to law because MADFAN was a plaintiff in the action. He contends appellees' fraud claim does not give MADFAN any theory of recovery because "[t]here was no theory or facts presented at trial by which a corporation could bring suit against its president, particularly one who controls 50% of the shares."

**{¶80}** We need not delve into the validity of this argument because, even assuming the argument is correct, it does not preclude the individual appellees from pursuing their

---

[1] Although Dino was originally named as a defendant, the trial only involved claims against Westerhaus individually. The court instructed the jury they had to determine whether Westerhaus committed fraud, not Dino. (Tr. 254.)

claims against Westerhaus. Although there may be questions regarding how appellees' recovery should be shared, these questions do not concern Westerhaus, and they do not render the judgment contrary to law.

**{¶81}** Therefore, the fourth assignment of error is overruled.

**{¶82}** The trial court's judgment is affirmed.

It is ordered that appellees recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

EILEEN T. GALLAGHER, JUDGE

MARY EILEEN KILBANE, P.J., CONCURS;
SEAN C. GALLAGHER, J., DISSENTS (WITH SEPARATE OPINION)

SEAN C. GALLAGHER, J., DISSENTING:

**{¶83}** I respectfully dissent. This case is deceptively simple — can we total up the damages sought at trial in the effort to demonstrate that the jury's award of $300,000

is not speculative and supported by the record?  In my view, we cannot.  If a jury award exceeds the damages sought at trial, although not always dispositive, it is safe to assume that something went awry.  *See, e.g., J. Norman Stark Co., L.P.A. v. Santora*, 8th Dist. Cuyahoga No. 81543, 2004-Ohio-5960, ¶ 45, fn. 3 (jury's award exceeded the itemized damages, and therefore, the jury's verdict cannot be afforded any deference); *Bokar v. Lax*, 8th Dist. Cuyahoga No. 75929, 2000 Ohio App. LEXIS 1654, *13-14 (Apr. 13, 2000) (without any evidence of itemized damages for the associated injury, the jury's verdict must be presumed to be speculative).

{¶84} Actual tort damages may not be established without evidence demonstrating the amount lost or a reasonable guide to the computation of monetary damages.  The shareholders simply alleged a type of damage, but failed to demonstrate a specific amount actually lost.  The jury was left to just guess the amount.  In my view, this position is in conflict with the law of this district — compensatory, pecuniary damages for fraud must be shown with certainty, and based on evidence and a theory that provides the finder of fact with "known, reliable factors that can reasonably guide the computation of damages."  *Carey v. Down River Specialties, Inc.*, 8th Dist. Cuyahoga No. 103595, 2016-Ohio-4864, ¶ 29.  There was no support for the $300,000 judgment or any reasonable method of calculating those damages in this case, and the judgment must be reversed.[2]

---

[2]  The majority decision conflicts with black-letter law.  *Stuffleben v. Cowden*, 8th Dist. Cuyahoga No. 82537, 2003-Ohio-6334, ¶ 27 (an attorney's representation of a corporation does not make that attorney counsel to the corporate officers, directors, or shareholders as individuals) (the majority's implication that Westerhaus directly represented the shareholders also conflicts with the shareholders' own theory of the case in which they instructed the jury that Westerhaus was never their

{¶85} The majority claims that nonpecuniary, noneconomic damages harmonize the difference between the jury award and the evidence of damages. However, no noneconomic damages were sought at trial, demonstrated by the undisputed fact that there was not a single mention of any such damage during the trial, including in the jury instructions, and the shareholders failed to submit the required interrogatories under R.C. 2315.18(D) before noneconomic damages could have been awarded. *Arbino v. Johnson & Johnson*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 27 (setting out the procedural requirement established by R.C. 2315.18(D) that a jury must return an interrogatory specifying the share of noneconomic damages).

{¶86} The shareholders had a good reason for this omission. Such damages cannot be recovered upon the claims asserted. Ohio does not recognize noneconomic damages for injury to property or upon claims for fraud by misrepresentation. *Sokolovic v. Hamilton*, 195 Ohio App.3d 406, 2011-Ohio-4638, 960 N.E.2d 510, ¶ 14 (8th Dist.); Restatement of the Law 2d, Torts, Section 549 (1977), adopted by *Northpoint Properties v. Charter One Bank*, 8th Dist. Cuyahoga No. 94020, 2011-Ohio-2512, ¶ 32-33. As the majority recognized, the shareholders claimed the fraud caused damage to the value of their business and their investments, and deprived them of the expected value of their property.

---

attorney); *Eppich v. Nureddin*, 8th Dist. Cuyahoga No. 95788, 2011-Ohio-2407, ¶ 14 (shareholder has no individual right of recovery in tort even if defendant's wrongdoing caused direct damage to the individual because the personal loss is duplicative of the harm caused to the corporation).

**{¶87}** The Restatement of the Law 2d, Torts, Section 549 (1977), confirms this district's conclusion in *Hamilton*. A plaintiff may elect to recover pecuniary losses or the difference in market value of the property at issue. *Hamilton* at ¶ 15. It is unclear how the restatement section could be read to include a right to recover nonpecuniary damages. On this point, the majority relies on *Favors v. Burke*, 8th Dist. Cuyahoga No. 98617, 2013-Ohio-823, which is inapplicable. That decision deals with violations of the Consumer Sales Protection Act ("CSPA"), which legislatively authorized a right to recover noneconomic, nonpecuniary losses in CSPA actions. R.C. 1345.09(A). Although noneconomic damages need not be pleaded, they must at least have been asked for and have been asserted upon a claim allowing for that type of recovery.

**{¶88}** Further, even if noneconomic damages could be a measure of damages in this case, the mental anguish the shareholders experienced while running their business is not evidence of noneconomic damages flowing from the fraud claim. When the shareholders experienced their supposed "mental anguish," none were aware the fraud had even occurred. It is nonsensical to conclude that the mental distress caused by the fraud was experienced before the shareholders were aware they were being defrauded. It also cannot be assumed that the shareholders would have felt angered or frustrated, or suffered aggravation or humiliation when the fraud was uncovered as "any reasonable person" would understand. Although certainly a reasonable person would have understood such, no shareholder testified to any of that, which again goes back to the fact that noneconomic damages are not recognized for fraudulent misrepresentation claims.

The record simply does not support the majority's divination that "the jury heard each plaintiff describe how their hopes, enthusiasm, and hard work were dashed by squandering and betrayal." No shareholder testified as to when they discovered the fraud, so we have no basis to infer their state of mind at that time.

{¶89} I understand the vitriol directed at both Makris and Westerhaus from the appellees' perspective. This appeal, however, is not about the parties' underlying conduct. We are a court of law, tasked first and foremost with ensuring the proper application of legal doctrines. It must be remembered that we are supposed to review the grant or denial of a motion for directed verdict de novo. *Groob v. KeyBank*, 108 Ohio St.3d 348, 2006-Ohio-1189, 843 N.E.2d 1170, ¶ 14. There is no deference to be given to the jury's determination, especially in regard to the legal issues involved.

{¶90} The majority concludes that there is evidence of nonspeculative damages totaling $300,000 in the form of (1) lost profits,[3] (2) unpaid salaries,[4] (3) $65,000 in rent

---

[3] The trial testimony does not contain any testimony demonstrating profits other than the ambiguous reference to "sales" being "double" what was projected. (Tr. 106:17-19.) Without knowing what the shareholders originally anticipated as their sales estimates, which is not included in the trial testimony or record, no one, much less the jury, is capable of determining the profits MADFAN should have enjoyed but for the alleged fraud.

[4] The majority's reliance on an unpaid salary is misplaced. Peloza testified to working between 80-100 hours a week, thus, according to the majority, entitling the shareholders to an award of damages for the value of Peloza's services. Importantly, Peloza failed to indicate the amount he was owed, or even a basis to calculate the salary. The jury was not given any evidence demonstrating what Peloza expected or even what an employee such as Peloza could expect. A jury award for unpaid salary, relying on that evidence presented, is nothing but speculative. We simply do not know how much Peloza was entitled to or had already received so as to compute the damages for the unpaid portion of his salary.

arrearage paid by MADFAN, (4) Makris's purchases of food under MADFAN's accounts for other business ventures, and (5) Makris's self-paid consulting fees.[5]  None of those types of damages support the jury verdict of $300,000 because no itemized monetary value or reasonable guide to computing an itemized value was actually presented for the jury's consideration.  We, as a court, have been down this road before.  In *Carey*, 8th Dist. Cuyahoga No. 103595, 2016-Ohio-4864, the plaintiff claimed he was entitled to lost profits incurred as a result of the alleged fraudulent act that prevented the plaintiff from operating a successful business.  *Id.* at ¶ 29.  The plaintiff presented no itemized damages and no method of calculating the supposed lost profits.  The unanimous panel concluded that the self-serving, conclusory statement that a business would have been profitable was purely speculative for the purposes of demonstrating damages, and accordingly, the plaintiff could not prove a fraud claim.  *Id.*

{¶91} The conclusion from *Carey* is based on a longstanding approach to damages.  *Kinetico, Inc. v. Indep. Ohio Nail Co.*, 19 Ohio App.3d 26, 30, 482 N.E.2d 1345 (8th Dist.1984).  In *Kinetico*, the plaintiff at least offered a conclusory statement suggesting an amount of lost profits caused by the defendant's alleged conduct.  *Id.* This court, however, unambiguously held that

> [m]ore is required of the plaintiff than merely his assertion (either directly or through an expert witness) that he would have made a particular amount in profits.  Unless the figure is substantiated by calculations based on facts

---

[5]  There is no testimony demonstrating how much was allegedly paid to the vendors or collected by Makris as a consulting fee.

available or in evidence, the courts will properly reject it as speculative or uncertain.

*Id*. at 30.

**{¶92}** There is no difference between the self-serving, conclusory statements in *Carey* and *Kinetico* and the statements made by the shareholders in this case. The shareholders listed a series of potential types of damages — such as unpaid salary, lost profits, or some form of fraudulent billing — and left the jury to speculate as to the value to attach to each category without any computational guide to determine the actual damages incurred. If a conclusory statement itemizing damages is insufficient to support a judgment, then by implication, a blanket statement that an unknown amount was owed would be insufficient to an even greater extent. I would follow the precedent from this court and hold that shareholders failed to offer any evidence justifying the $300,000 judgment. Further, the jury verdict exceeded the itemized damages sought at trial, and as such, it must be presumed that the judgment was speculative. *Bokar*, 8th Dist. Cuyahoga No. 75929, 2000 Ohio App. LEXIS 1654, *4 (Apr. 13, 2000).

**{¶93}** I acknowledge that at least the rent arrearage was reduced to an itemized amount in this appeal. We do not know the amount of rent arrearage based on the record. The $65,000 figure came from the shareholders' trial counsel, not any of the witnesses. At one point during cross-examination, counsel asked, in reference to the lease agreement being signed the date MADFAN took possession of the building in order to begin renovations instead of from when the restaurant opened: "without anybody else in this room knowing what you did, you sat down with [Makris], and created a document

for your client, that indebted these guys $65,000, before they even open the doors." (Tr. 153:8-11.) It is basic trial principle that counsel's question is not evidence, further punctuated by the fact that Westerhaus answered in the negative anyway. *Id.*

**{¶94}** The majority position ignores the shareholders' own theory of the case and self-limited reliance on an inapplicable measure of damages. None of the damages the majority claims as supporting the jury's verdict were actually requested as a measure of damages at trial.

**{¶95}** "'Ohio courts have generally followed, whether specifically noted or not, the principles set forth in the Restatement (Second) of Torts when discerning the propriety and amount of damages in fraud cases.'" *Northpoint Properties*, 8th Dist. Cuyahoga No. 94020, 2011-Ohio-2512, ¶ 32, quoting *Auto Chem Laboratories, Inc. v. Turtle Wax, Inc.*, S.D.Ohio No. 3:07cv156, 2010 U.S. Dist. LEXIS 100677 (Sept. 24, 2010). The applicable provisions provide that one may recover for fraud, including in the concealment or omission, the difference in the value of what was actually received as compared against the purchase price or other value given along with any other demonstrated pecuniary or economic loss. Restatement of the Law 2d, Torts, Section 549 (1977).

**{¶96}** The shareholders willingly limited their measure of damages at trial. As the jury was unambiguously instructed, the damages sought upon the fraud and civil conspiracy claims were "the actual damage directly caused by the fraud. The measure of damages in this case is the difference between the represented value and the actual value

at the time of the transaction." (Tr. 258:2-5, 260:11-14.) "Actual damages" are not to be confused with a measure of those damages. Actual damages are defined as compensation for actual and real loss or injury. *Whitaker v. M.T. Automotive, Inc.*, 111 Ohio St.3d 177, 2006-Ohio-5481, 855 N.E.2d 825, ¶ 18.

**{¶97}** Actual damages in fraud cases can be calculated through the difference in value or cost to repair, among other measuring sticks. *Melenick v. McManamon*, 8th Dist. Cuyahoga No. 92453, 2010-Ohio-1051, ¶ 43. Thus, there is a stark difference between instructing the jury that a plaintiff is only entitled to actual damages and instructing on how to measure or compute those actual damages. In this case, the shareholders decided that their measure of actual damages was the difference between the represented and actual value of the asset based on a misrepresentation. Unfortunately, the shareholders failed to introduce evidence substantiating their chosen method of computing actual damages. As "nonsensical" as the majority believes the theory of the shareholders' case to be, it was their decision to limit their claim for damages. Courts are not in the business of protecting parties from their chosen trial strategies.

**{¶98}** In my view, the majority supplants the shareholders' chosen strategy with the majority's approach of bundling any and all potential measures of damages, neither sought from nor considered by the jury, and never itemized by the shareholders, claiming that under the Restatement of the Law 2d, Torts, a plaintiff is permitted to seek all pecuniary damages. The majority, however, does not affirm based on evidence of pecuniary damages. Instead, the majority relies on R.C. 2315.18(A)(4) that permits

recovery for nonpecuniary damages, a type of damages never even mentioned at trial and an instruction never provided the jury.

{¶99} The only evidence of actual, itemized damages presented to the jury was the shareholders' initial purchase of the MADFAN shares totaling $87,000 and the $41,500 the shareholders loaned to the corporation pursuant to the meeting of the directors (the directors included three of the shareholders) on May 21, 2007. Neither claim is evidence of ascertainable damages even if we assume that the shareholders individually had the right to recover for diminution of corporate worth caused by the fraudulent conduct. *Adair v. Wozniak*, 23 Ohio St.3d 174, 178, 492 N.E.2d 426 (1986) (wrongdoing of a defendant damaging the corporate worth, demonstrated through the diminution in value of stock, accrues to the corporation and not to the shareholders individually); *Eppich*, 8th Dist. Cuyahoga No. 95788, 2011-Ohio-2407, ¶ 14 (shareholder only has individual right to recover in tort if defendant's wrongdoing caused direct damage to the individual and is not duplicative of the harm caused to the corporation).[6]

---

[6] It should be noted that the shareholders forfeited their right to recover the full amount paid for the stock certificates. Purchasers of securities have the right to seek the full amount paid for a stock transaction from any person aiding the seller, based on the allegations of fraud in procuring the investment, within five years of the transaction. R.C. 1707.43(A). Rescission, or voiding the purchase of the 2004 stock transaction, to seek a return of the full value of the investment was not a remedy available at the time the shareholders filed the complaint. *Kondrat v. Morris*, 118 Ohio App.3d 198, 205, 692 N.E.2d 246 (8th Dist.1997) (claims for fraudulent sale of unregistered securities are covered by the five-year statute of limitations found in R.C. 1707.43); *Metz v. Unizan Bank*, 649 F.3d 492, 499 (6th Cir.2011) (if the claim implicates securities fraud, which includes the fraudulent sale of shares of stock in a corporation under R.C. 1707.01(B), the five-year statute of limitations under R.C. 1707.43(B) applies). The shareholders' request for damages at trial cannot circumvent unambiguous corporate law by seeking the same recovery as an alleged tort damage. As a result, the shareholders were not entitled to the purchase price of the stock as a measure of damages. It is for

{¶100} Using the initial investments or unpaid debts as a measure of damages necessarily implicates the value of the shares the shareholders received in consideration and the valuation of MADFAN after the cessation of business. Both hinge on MADFAN's corporate worth. In order to demonstrate actual damages, the shareholders had to demonstrate that MADFAN lacked sufficient assets in order to satisfy outstanding debts and buy out the dissatisfied shareholders once liquidated. Otherwise, the shareholders would be recovering damages that were not actually incurred.

{¶101} Moreover, it cannot be inferred that the shares were worthless. The shareholders testified that the restaurant ceased operations; however, that evidence alone does not support an inference that the shares in MADFAN are without any value so as to entitle the shareholders to full recovery of their stock purchase. To reach a conclusion as to the ending value of the shares, one would impermissibly be required to stack an inference — that MADFAN disposed of every asset after ceasing operations, which directly impacts the value of the shares — on top of another inference — that the sale of those assets was insufficient to cover all outstanding liabilities and buy out the dissatisfied shareholders. *Bier v. Am. Biltrite*, 8th Dist. Cuyahoga No. 97085, 2012-Ohio-1195, ¶ 22 (Ohio law precludes the stacking of inferences to prove a claim); *Mercer v. Wal-Mart Stores, Inc.*, 10th Dist. Franklin No. 13AP-447, 2013-Ohio-5607, ¶

---

this reason the shareholders measured their damages by diminution in value, a fact ignored by the majority's analysis.

20 (drawing an inference from a deduction that itself is purely speculative and unsupported by established fact violates Ohio law).

{¶102} We cannot infer that MADFAN's assets were entirely disposed of after the restaurant ceased operations for a more basic reason — the shareholders and MADFAN admitted that they failed to remove MADFAN's assets after the restaurant ceased operations. In Westerhaus's requests for admissions, the shareholders were asked to admit that they simply abandoned all corporate assets, necessarily meaning that the shareholders failed to properly liquidate them to cover MADFAN's outstanding debts. The trial court deemed the unanswered request as admitted for trial without objection. The shareholders, as directors of MADFAN, failed to take even the rudimentary steps of liquidating assets to cover their losses, which is also supported by the fact that the trial court in its September 29, 2015 journal entry referenced the shareholders' request to gain access to MADFAN's property.[7]

{¶103} The majority cannot now rely on its sua sponte claim that the corporate shares were worthless as one measure of damages when the shareholders are going to receive a double recovery, one for the judgment and the second when they sell off MADFAN's assets after obtaining a postjudgment order entitling the shareholders to enter Olympic Investment's property. At trial, the shareholders were precluded from

---

[7] The trial court ordered that Olympic Investment, the owner of the property, allow the shareholders access to the building. It can only be assumed, since MADFAN does not own the building, that the shareholders sought access to the building to obtain and liquidate MADFAN's assets.

demonstrating that liquidating the corporate assets would be insufficient to cover the corporation's outstanding debt because of the admission.[8] The majority's reliance on an assumption that such assets were liquidated and insufficient to cover outstanding liabilities directly conflicts with the record and the shareholders' own theory of the case.

{¶104} I briefly need to address the majority's analysis used to overrule Westerhaus's assigned error regarding the judgment notwithstanding the verdict. The majority concludes that the judgment notwithstanding the verdict was properly denied because Westerhaus aided Makris in converting money and assets from MADFAN. The majority then concludes that the conversion was a fraud committed by Westerhaus. Conversion and fraud are separate tort claims. Westerhaus's complicity in aiding a

---

[8] Ceasing business operations is not the same as liquidating a corporation's assets for the purpose of evaluating the value of the shareholders' remaining interest in the corporation. The diminution in value of the stock as a measure of damage to the corporate worth (among other measures of damages, such as reduced earnings or accumulation of personal debt and liabilities from the company's financial decline) cannot be demonstrated through the value of the initial stock purchase alone. Determining the value of the shares requires a comprehensive inquiry into the corporation's assets, liabilities, and receivables. *See, e.g., Armstrong v. Marathon Oil Co.*, 32 Ohio St.3d 397, 406, 513 N.E.2d 776 (1987) (the "fair cash value" a shareholder is entitled to receive for shares is the intrinsic value of the shares determined from the assets and liabilities of the corporation and consideration of every other factor bearing on value); R.C. 1701.01(N) (liquidation price is the "amount or portion of assets required to be distributed to the holders of shares of any class upon dissolution, liquidation, merger, or consolidation of the corporation, or upon sale of all or substantially all of its assets"). At the risk of sounding elementary, diminution in value of an investment requires both a starting and ending value. *See, e.g., Oryann, Ltd. v. SL & MB, L.L.C.*, 11th Dist. Lake No. 2014-L-119, 2015-Ohio-5461, ¶ 62, citing *Northpoint Properties*, 8th Dist. Cuyahoga No. 94020, 2011-Ohio-2512, ¶ 30 (damages for fraud include the reduction in value to the property). The majority glosses over this distinction and simply assumes the complicated evidentiary standard can be demonstrated with a blanket assumption. This conflicts with longstanding law in this district. *See Northpoint Properties.*

conversion does not support the fraud claims alleged in the complaint. Further, the majority's unsupported conclusion that Olympic Investment, as a separate corporate entity, could not lease its properties to MADFAN because both corporations shared a similar shareholder not only fails to support a fraud claim, failing to demonstrate any material misrepresentation by Westerhaus, but is a misunderstanding of corporate law. *Kiddie Co. Enrichment Ctr. v. Cuyahoga Cty. Bd. of Revision*, 2012-Ohio-5717, 984 N.E.2d 347, ¶ 13 (8th Dist.) (a corporation is a separate and distinct legal entity from its members or shareholders).

{¶105} Nevertheless, without evidence demonstrating actual damages, the plaintiffs were unable to establish each element of their fraud and conspiracy to commit fraud claims at trial. Even if we assume that every other element had been proven, Westerhaus was entitled to a judgment as a matter of law on the issue of damages alone. The trial court should have granted the motion for a directed verdict or judgment notwithstanding the verdict. Coupling the majority's contravention of precedent with the disregard for the shareholders' own theory of recovery, I must dissent.